569 A.2d 706

**SUPERVISOR OF ASSESSMENTS OF PRINCE GEORGE'S COUNTY**

v.

**Melvin J. BERMAN, et al.**

**No. 819, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Feb. 8, 1990.

David M. Lyon, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Kaye Brooks Bushel, Asst. Atty. Gen., on the brief), Baltimore, for appellant.

Mark J. Friedman (Piper & Marbury, on the brief), Baltimore, for appellees.

Argued before BLOOM, ROSALYN B. BELL and CATHELL, JJ.

CATHELL, Judge.

This case comes to us as a result of a tax assessor's refusal to utilize the correct approach to the assessment of a major mall department store. The Court of Appeals, in

*Supervisor v. Ort Children Tr.*, 294 Md. 195, 448 A.2d 947 (1982), stated the correct approach:

This Court has held that earning capacity is properly recognized in assessing property.... In the instant matter, the property is utilized for producing income.... The property's capacity to produce more income than that currently realized is impeded by the existing lease for years to come. The Maryland Tax Court recognized that this factor has some adverse effect on the market value of the property and took that factor into consideration in revising the assessment. The action of the Maryland Tax Court is entirely consistent with our decisions that permit the determination of full cash value to be made by reference to the willing purchaser-willing seller test.

*Id.* at 204–05, 448 A.2d 947.

Even where a leasehold advantage is admitted, the analysis which prohibits any consideration of contract rent is at odds with the willing seller-willing purchaser approach to market value for property tax purposes.

*Id.* at 208, 448 A.2d 947.

Mr. Berman, the appellee, appealed an assessment of the Supervisor of Assessments of Prince George's County to the Property Tax Assessment Appeal Board, and ultimately appealed to the Tax Court. Berman prevailed at the Tax Court, which reduced the Supervisor's assessment from $7,139,820 to $2,860,000. The Supervisor then appealed that decision to the circuit court, where Judge Salmon, in a well-reasoned and complete analysis both of the facts and of the law, affirmed the Tax Court. This appeal resulted.

### The Simplified Facts [1]

Montgomery Ward (Wards) and appellee Berman entered into a long term lease arrangement in approximately 1968, whereby Wards would operate a mall anchor store on land owned by Berman. Wards was, it asserts, in an arms

---

1. *Many* specific facts are omitted as they are not necessary to our decision.

length transaction, given very favorable treatment in recognition that it would anchor a mall and thus attract customers and satellite tenants. It was understood at the time of the lease that in such arrangements the anchor tenant's rental is disproportionately low in recognition of its ability to attract satellite tenants. The anchor tenant's low rent is compensated for by the imposition of substantially higher rents upon the satellite tenants, to the end that the landlord would achieve the desired rental level for the entire mall through a disproportionate rental levy—low for the anchor, high for the satellites.

The trial court found the litigants to have stipulated before the Tax Court, that at the time the lease was entered into it was an arms length, good faith lease entered into by experienced parties; that Berman at that time considered the anchor store an important step in achieving his ultimate goal of developing the adjacent site into a shopping mall; and that it was important to Wards that such an adjacent mall be constructed.[2]

The ultimate result was that the Wards lease, standing alone, provided for contract rent that did not, in the particular assessment year, approach the market rent of such premises if the Wards property was newly constructed and/or unencumbered by contract rent.

The Supervisor of Assessments, presents three questions. They are:

1. Did the Maryland Tax Court make an error of law in its interpretation of the legal precepts set forth in *Supervisor of Assessments of Allegany County v. Ort Children Trust Four*, 294 Md. 195, 448 A.2d 947 (1982)?

---

**2.** Our review of the record indicates that the stipulation before the Tax Court was actually that Mr. Wolford Berman would so testify. That discrepancy is of little importance, considering that the other evidence introduced, in addition to the testimony of Mr. Wolford Berman, overwhelmingly supports the Tax Court's finding on that issue.

2. Did the Maryland Tax Court commit an error of law when it applied the legal precepts embodied in *Ort* to the facts in this case?

3. Did the Maryland Tax Court give consideration to all relevant facts which impact the value of the subject property?

We respond by answering no to questions one and two, and yes to question three, thereby affirming the decision of the circuit court. We explain.

The Tax Court found, in part:

The Court finds that the financing and the lease arrangement were both arms length and made in good faith ... entered into in approximately 1968.

\*   \*   \*   \*   \*   \*

We believe that the lease, at the time it was entered, was based on the market rents. And there is unrefuted testimony from Mr. Lipman as to this fact.

\*   \*   \*   \*   \*   \*

The central issue in this appeal, we feel, is the extent to which the long-term lease to Montgomery Ward should be considered in determining the market value.

\*   \*   \*   \*   \*   \*

The Court concluded in that case [*Ort*] that the analysis [sic] which prohibits any consideration of contract rent is at odds with the willing seller/willing purchaser approach to market value for property tax purposes.

In this particular case the Petitioner has presented an analysis which considered the contact rent paid by the long-term tenant. We agree with the Petitioner's approach in this case.

On the other hand, the appraisal report of the assessor gives no consideration, in its economic approach, to the actual contract long-term lease rent which is significantly less than the market rent at the present time; or on the appropriate date of finality.

\*   \*   \*   \*   \*   \*

Although *Ort* does not mandate that contract rent must be used to value income producing property when a long-term lease is involved, it does require that the affect of the lease be considered in any value.

The Respondent [appellant] has failed to consider the lease to which the property is subject.

Petitioner's income approach truly reflects, we believe, what the willing buyer would look for in a determination of value.

Appellant informs us that the Court of Appeals in *Ort* grounded its opinion on two specific factors, i.e., "(1) that the lease was a bona fide, arms length transaction, and (2) that the rental amount represented economic rent at the time it was entered into . . . ." Thus the Supervisor asserts that the Court of Appeals categorically limited its decision in *Ort* to situations where the lease represented market conditions at the time of its commencement. Portions of the testimony before the Tax Court are illustrative of the substantiality of the evidence before it which supports its decision on this issue in light of the *Ort* decision.

Ronald Lipman, a qualified expert appraiser who testified for Berman, clearly explained the nature and purpose of the leasing arrangement at issue here, and clearly indicated that this type of arrangement reflects the industry norm, which is achieved as the result of good faith, arms length bargaining.

THE WITNESS [Lipman]: The satellite stores which were built in the mall adjacent [to] Montgomery Ward benefit from Montgomery Ward's existence. They benefit to the extent that the tenants in them are willing to pay rents that will reflect Montgomery Ward's existence adjacent and connected to the mall.

When they pay rents to Mr. Berman, or the owner of that shopping center, that Mr. Berman built adjacent to the store, those rents are high—are higher than the rents that are being paid on department stores, and they are reflected in any income approach that any sophisticated

assessor or appraiser is using to value the property. I assume . . .

\* \* \* \* \* \*

[I]f you take the macroview and look at the entire shopping center, the value that is assessed against the entire shopping center, if you used my Three Million on the Montgomery Ward store, and appropriate income value on the satellite stores, you would get an overall value which would be fair and balanced for the whole property.[3]

[Y]ou have to recognize the fact that in order to get Montgomery Ward or any anchor to anchor a regional mall, you have to make a deal. You have to attract them. They know they can make the deal. That's the market place. . . .

When that deal is made, it's made at the level which reflects that the presence of the anchor allows the developer of the adjacent mall to charge the Sixteen, Eighteen, Twenty, Twenty-five Dollar a square foot rents for the satellites.

[W]hen an assessor appraises that component, the satellite component of the mall, he is picking up some of the value that you feel you are being denied in this appraisal. He is picking up all of the value that you are being denied in this appraisal.

\* \* \* \* \* \*

Q. . . . [S]o according to you then, the value of this property should be lowered for assessment purposes because it acts as an attraction for the satellite stores?

A. It's the catalyst. It's the driving force which allows the owner of the adjacent stores to exact from those tenants rents in the teens and low twenties per square foot, triple net.

On the issue of market value when the lease was negotiated, Mr. Lipman was asked:

---

3. Subsequent ownership changes would have no effect on the arms length-good faith aspects of the original negotiations and transactions.

Q. Mr. Lipman, did you consider whether the lease payments ... the question of whether the lease payments set forth in the lease represented a market rate for the 1968–1970 period when the lease was entered into?

\* \* \* \* \* \*

A. Yes.

\* \* \* \* \* \*

A. ... And the rate in the Dollar Sixty a square foot range is very consistent with the rate that I have found in other leases for buildings similar to this, where the negotiations took place in that time frame.

\* \* \* \* \* \*

Q. ... [A]round the same time frame, have you found that the lease structure, not just the rental structure, the overall lease structure for this lease, this Montgomery Ward lease, is similar or dissimilar to anchor leases that you have examined elsewhere?

A. This is very similar.

\* \* \* \* \* \*

Q. Did you reach a conclusion as to whether the rental structure set forth in this lease represented what was market rate in the 1968–1970 period?

A. I did.

\* \* \* \* \* \*

A. I do believe that this rental agreement represents fair economic rent for the subject property as of the 1970, 1969, 1971 time frame.

There was no testimony presented that conflicted with Mr. Lipman's testimony as to the market rent in the 1968–71 time frame. Thus, it is clear that the situation faced by the Tax Court in this case concerned a lease and leasing arrangement that represented market conditions at the time of its commencement. The appropriateness of including a contract rent income approach in determining market value under a willing purchaser/willing seller analysis was also indicated by the assessor when he testified.

Q. Now I take it you would also agree that any investor coming in to look at the Montgomery Ward property would have to take into account the existence of the lease and the income stream that one could derive from that lease?

A. [From Mr. McGucken] From an investor point of view, yes. Yes.

Q. Well from any purchaser's point of view?

A. From a purchaser's point of view as well, yes.

At another point the assessor was asked:

Q. Mr. McGucken, do you agree that the rental roll at the mall should be a basis for a determination of market value of the Laurel Center Mall?

A. Yes, the rent roll is very important to the value of the mall, obviously yes.

Later another exchange occurred:

Q. And just to reiterate it—I think you said it—the actual lease on the property [Wards] was not taken into account by you at all in developing your valuation?

A. Well ... I felt that it's not proper to use it as an indication of value. I ...

The Tax Court inquired of Mr. McGucken:

JUDGE MARTZ: Do you think there is somebody out there that will pay Seven Million Dollars for this piece of property?

THE WITNESS: With the current leases? Is that how you are phrasing your question?

JUDGE MARTZ: Yes, sir.

THE WITNESS: No.

      \*     \*     \*     \*     \*     \*

Q. ... Did you take into consideration the leases when you were first valuing this property for assessment purposes?

A. No.

Judge Martz, for the Tax Court, asked of the Supervisor of Assessments: "Tell me why this is not *Ort.*" Appel-

lant's counsel conceded in closing argument that the lease agreement resulted from an arms length transaction, stating:

> [A]nd nobody is going to sit here and tell you that this wasn't an arms length, i.e. . . . . But we are going to be indicating to you that we don't think it's a proper indication of value because it's not what we consider, for lack of another tern [sic], a bonafide [sic] lease. That is, a lease that was put together with the typical motivations of the landlord and tenant.
>
> Now they're going to be coming back and saying this is how all the malls are done. That, I think, is an over simplification of a response.

>     \*      \*      \*      \*      \*      \*

> If we valued the rest of that mall, Hech't [sic] and Woddie's [sic], or whoever they are, would be paying assessments on Nineteen Dollars a square foot. We have then created an unlevel playing field, based upon helping Montgomery Wards because of their financial arrangement in the very beginning.[4]

The Supervisor further states, "Therefore, the Tax Court misapplied the law set forth in *Ort* to the facts in question when it adopted a value which *only* considered contractual income that did not represent all aspects of the full cash

---

4. While appellant's counsel might be correct that an unlevel playing field exists, he is incorrect in assuming that a contract rent income approach assessment would create that unlevelness. The parties, i.e., the landlord, Wards, Hechts, Woodies, and the satellite stores created the "field" by their voluntary action in entering into the leases. Thus, the marketplace created the field. It is not the assessor's function to change market place "playing fields." It is his duty to tax market places as he finds them. In that process the individual assessor's sense of marketplace business morality has no place. If that marketplace "playing field" needs leveling it is, solely, absent any illegality, the function of the legislature to make those changes. Under the facts of this case we perceive no legitimate reason why this case should have progressed to this Court other than the assessor's reluctance to accept the clearly stated mandate in *Supervisor v. Ort Children Tr.*, 294 Md. 195, 448 A.2d 947 (1982), which indubitably holds that the effect of such a lease must be considered in the assessor's valuation.

value." (emphasis in original) Appellant alluded in its brief and in oral argument to a discrepancy in the Tax Court's valuation in *Ort,* inferring that because the Tax Court had valued that property at an amount higher than the capitalization of the contract rent-income stream, it must have included current value or tenant advantage elements. Therefore, the Supervisor argues that because the Tax Court used only the contract rent-income stream basis in the instant case, it must be reversed. The Court of Appeals did not specify in *Ort* that it had determined the actual basis for that Tax Court's assessment, saying: "In its written opinion the Tax Court does not specifically set forth how its valuation was determined." *Ort,* 294 Md. at 199, 448 A.2d 947. The *Ort* Court then reiterated what the Tax Court had found: "It found, however, 'that the present lease terms which specify the rent to be paid and other conditions should have been accorded more weight by the Supervisor and that this assessment appealed from should be reduced.' "[5] *Id.* at 199, 448 A.2d 947.

The Tax Court's opinion, affirmed in *Ort,* also stated:

In the instant case, if any increment in value has occurred since the lease began in 1963, such increment has inured to the benefit of the [lessee], Sears, and the leasehold interest of the tenant is not subject to taxation in Maryland and what is taxed to the owner is the fair market value of his property.

*Id.* at 199, 448 A.2d 947.

In an attempt to minimize the effect of the Court of Appeals' affirmance of that opinion, the appellant emphasizes language at another point in the *Ort* opinion, where that Court stated, "From this the Supervisor concludes that the leasehold here is considered as part of the real estate assessed to the Trust, as owner. We agree." *Id.* at 210, 448 A.2d 947.

---

**5.** The Supervisor in *Ort* to an extent had utilized contract rent in its assessment unlike the present case, where the Supervisor refused to utilize it to any extent.

In light of the Court's opinion affirming the decision of the Tax Court, which included the portions of the Tax Court's decision we quote above, we do not understand the Court of Appeals to have held that the tenant's advantage in the leasehold must be assessed to the owner, but that the leasehold's benefit to the owner, if any, must be included in the assessment. This is particularly evident to us in light of the Court of Appeals' statement:

> More fundamentally, both the leasehold [6] and the reversion have been assessed by the Tax Court to the Trust, as owner. That assessment represents the Tax Court's judgment of full cash value.... The Supervisor's arguments that the assessment has resulted in a partial exemption, or in an invalid subclassification for properties burdened by disadvantageous leases, similarly beg the question.

*Ort,* 294 Md. at 211, 448 A.2d 947. Thus, the owner's interest in a leasehold, not the tenant's interest, may, as we see it, be determined by the income stream, and any other *direct* benefit to him derived from that lease.

The Tax Court had before it the appraisals of both Mr. Lipman and the assessor. Mr. Lipman fully explained his appraisals under the market approach, cost approach, and income approach. He also gave reasons why he rejected the market approach because of a lack of comparables. He gave a cost approach appraisal of "about Eight Million Dollars." He then offered his opinion as to the persuasiveness of the income approach, fully explained it, and appraised the property in the "Three Million range." [7] The assessor stated that he also used all three approaches, i.e., cost, income, and market. His cost approach valuation was

---

6. The Tax Court opinion, affirmed in *Ort,* held: "[T]he leasehold interest *of the tenant* is not subject to taxation in Maryland ...." *Ort* 294 Md. at 199, 448 A.2d 947 (emphasis added).

7. On cross-examination he discovered a computer computation error that during trial resulted in an adjusted income approach appraisal of $2,860,000.

($8,198,500), his market valuation was ($8,636,840) and his income approach valuation ($7,823,355). In determining his income approach valuation he refused to consider the contract rent, but instead based it entirely on current market leases—"market rent."

### The Standard of Review

We stated the appropriate standard of review in *318 North Market St. v. Comptroller*, 78 Md.App. 589, 554 A.2d 453 (1989):

> The standard of review of a decision of the Tax Court is, of course, a very limited one. Maryland State Government Code Ann. § 10–215(g)(3) provides that a reviewing court may:
>
>> reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision of the agency:
>>
>> (i) is unconstitutional;
>>
>> (ii) exceeds the statutory authority or jurisdiction of the agency;
>>
>> (iii) results from an unlawful procedure;
>>
>> (iv) is affected by any other error of law;
>>
>> (v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or
>>
>> (vi) is arbitrary or capricious.
>
> Thus, the reviewing court, whether it is this court, the Court of Appeals, or the circuit court, shall affirm the decision of the Tax Court if it is supported by substantial evidence and is not erroneous as a matter of law.... In applying the substantial evidence test, of course, the reviewing court must not substitute its judgment for that of the Tax Court.

*318 North Market St.* at 593–94, 554 A.2d 453 (citations omitted). *See also Comptroller v. Haskin*, 298 Md. 681, 689–90, 472 A.2d 70 (1984) (where the Court of Appeals stated, "Section 229 [Md.Code Art. 81] further provides that '[t]he circuit court shall affirm the Tax Court order if it is

... supported by substantial evidence appearing in the record.' "); *St. Leonard Shores Joint Ven. v. Supervisor,* 307 Md. 441, 446–47, 514 A.2d 1215 (1986) (where the Court reiterated that standard of review and furnished in support thereof an extensive listing of authorities).

The Supervisor presents in his brief that "[i]t [Tax Court] only considered the actual income approach .... It ignored all three of Mr. McGucken's approaches ...." What the Tax Court actually did was refuse to accept appellant's assessment because appellant did not consider the contract rent income approach at all in that assessment. Having thus rejected the assessor's appraisal, it accepted an appraisal which was supported by substantial evidence.

Having had all of the appraisals before it, it presumably considered each, in addition to all the other evidence before it, and selected an appraisal that was supported by substantial evidence. To select among alternatives is not equivalent to ignoring the unselected alternatives, especially when, as here, none of the assessor's appraisals were, in light of *Ort*'s requirement that contract rent be considered, supported by substantial evidence.

For the reasons we have stated, we affirm.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.