967 A.2d 253

## COMPTROLLER OF the TREASURY

v.

## J/PORT, INC.

No. 114, Sept. Term, 2008.

Court of Special Appeals of Maryland.

March 10, 2009.

610

Christina A. Milnor (Leslie M. Romine, Douglas Gansler, Atty. Gen., on brief), for Appellant.

Todd D. Lochner (Jonathan Pomerance, Lochner & Schwenk, LLC, on brief), Annapolis, for Appellee.

Panel: KRAUSER, C.J., DAVIS, ROBERT E. CAHILL, JR. (specially assigned), JJ.

DAVIS, J.

The Comptroller of the Treasury (Comptroller), appellant, denied a request by J/Port, Inc., appellee, for a refund of

certain admissions and amusement taxes and sales and use taxes imposed on fees charged by appellee in relation to its sailing and boating club. Appellee sought judicial review of this decision in the Maryland Tax Court (Tax Court) (Martz, C.J.). After a hearing on the merits held on April 18 and May 30, 2007, the Tax Court affirmed the Comptroller's denial of the refund request. Appellee noted an appeal and oral arguments were held on the matter before the Circuit Court for Anne Arundel County. On March 7, 2008, the circuit court (1) vacated the Tax Court's judgment as to both the admissions and amusement and the sales and use tax [1] and (2) affirmed the Tax Court's determination that appellee's constitutional argument was without merit. The Comptroller noted his timely appeal of the circuit court's judgment and presents two questions for our review, which we have rephrased and reorganized as follows:

I. Did the circuit court err by ruling that the Tax Court's legal conclusion that appellee's membership fees are subject to an admissions and amusement tax was not supported by substantial evidence?

II. Did the circuit court err by ruling that the Tax Court's legal conclusion that appellee's membership fees are subject to a sales and use tax was not supported by substantial evidence?

For the reasons that follow, we answer both questions in the affirmative. Accordingly, we reverse the judgment of the Circuit Court for Anne Arundel County and affirm the decision of the Tax Court.

---

1. The circuit court remanded the case to the Tax Court "for further findings consistent with this opinion." The gravamen of the circuit court's opinion is that the Tax Court's conclusions were legally erroneous and not supported by substantial evidence in the record. The circuit court held that the Tax Court did not apply the "proper test" for determining whether appellee's membership fees were "club dues" exempt from the admissions and amusement tax. The circuit court also held that the Tax Court erred by concluding that annual dues paid to appellee were subject to the sales and use tax as "yearly rentals."

## FACTUAL BACKGROUND

Appellee was incorporated in 1992 to sell boats. Appellee also operates the J/Port Sailing Club and the Chesapeake Boat Club (the Club). The Club represents approximately half of appellee's gross profits. The boat sale operations, the Club and a sailing school are all operated out of a marina leased by appellee. The only taxes at issue in this case are those related to Club membership fees.

From 2002 to 2005, the time covered by appellee's refund request, appellee maintained a fleet of fourteen sailboats and four Albin powerboats. The fleet of sailboats was comprised of eight J/80's (twenty-six-foot day sailers), three J/105's (thirty-four and one-half-foot day sailers/overnighters) and three J/32's (overnight cruisers).[2] Appellee maintains that, during this time, the Club had between 142 and 171 members. Informational material produced by appellee describes the Club as follows:

The concept of J/Port Sailing Club was founded in 1993 out of the needs of our own clients—to have easy-to-sail, high performance J/Boats available on short notice and at a fraction of the cost you might anticipate for this much FUN! Becoming a member is a perfect way to get on the water and enjoy sailing with minimal expense and hassle.

There are various levels of membership in the Club, each of which allow use of certain boats at certain periods of time. Generally, Level One membership allows unlimited use of the J/80, with a smaller annual fee for members seeking unlimited "midweek" use of the J/80 Monday through Friday. Under Level One membership, three session slots are available for use of the boats, which may be reserved up to seven days in advance.

---

**2.** Paul Mikulski, appellee's president and majority owner, testified at the Tax Court hearing that the letter "J" in J/Port and J/Boats stands for Johnstone, the designers of the boats sold by appellee and used in appellee's sailing club.

Level Two membership generally allows access to larger boats. A member of Level Two is allowed unlimited day sailing of the J/80 plus fourteen days of guaranteed advance reserve time that can be used for extended cruising aboard the J/105, J/32 and J/28. Level Two membership also provides unlimited standby days, allowing, *inter alia*, reservations to be made within twenty-four hours of sailing. Level Two's annual fee is approximately double that of Level One. Level Two membership is also available for a period of two years. Both Level One and Level Two require a mandatory sea tow insurance fee along with one time charges for an orientation fee and a refundable deposit.

In addition, appellee charges an annual fee for membership in the Chesapeake Boat Club, which allows use of the Albin powerboat. With this type of membership, a member receives points that can be applied towards the scheduling of boats. Appellee further offers combination sail and powerboat memberships.

Mikulski testified that all Club members, regardless of membership level, retain unlimited access to club vessels as long as a vessel is available and subject to the terms of membership. Reservations are made via a "complex" on-line system that indicates which boats are reserved at various times. Two club members testified that this system was a "tremendous value" and a "great help" in enabling use of the boats.

Appellee emphasizes that all members within each membership level pay the same annual dues regardless of how many times the member actually uses the boats. There are no additional fees for using the Club's boats, although members remain responsible for covering the cost of "running expenses," such as fuel. Mikulski testified that appellee had one operating account where all member contributions are placed, such that the fees paid by any member may be used to cover expenses for a boat to which a member is not necessarily allowed access. Even though boat usage within each level may vary according to the member, all members within a level

are charged the same annual fee. A member is not charged additional money to bring a guest or to enter the Club's marina, which includes picnic tables and a covered shelter.

The Club further provides sailing lessons, organizes social events and races, and conducts community outreach activities for its members. Mikulski acknowledged that appellee used the same premises to conduct both its Club operations as well as its other business operations. Purchasers of boats are considered "honorary members" of the Club and may use Club facilities and participate in Club events.

### Request for and Denial of Tax Refund

The primary issue in this case is whether the annual fees paid by members of the Club are subject to both (1) an admissions and amusement tax and (2) a sales and use tax as codified in Maryland's Tax–General Article (T.G.).[3] In a letter dated December 1, 1994, the Comptroller advised the Club that annual member dues were subject to both of these taxes:

[T]here are two taxes that may apply to the fees being paid to the Club: admissions and amusement tax and sales and use tax. The admissions and amusement tax is imposed on the gross receipts for any admission and amusement charge, specifically defined to [include] charges for the use or rental of recreational equipment, of which sailboats are a common example. The use of the terms "club," "dues" and "members" does not alter or disguise the fact that the transaction you described in your letter, and that we discussed on the phone, constitutes sailboat rentals. Therefore, the fees charged to your members are subject to the admissions and amusement tax. [ . . . ]

If the transactions are bareboat rentals, as opposed to captained charters, then the transactions are retail sales, also subject to the 5 percent sales and use tax. In this case, the admissions and amusement tax is capped at 5 percent, in that the total of the two taxes cannot exceed 10 percent.

---

**3.** All discussion of the Tax–General Article in this opinion will refer to Md.Code (2004 Repl.Vol., 2008 Supp.).

In your letter, you indicate that a membership in [the Club] parallels that of a health club. However, I see no correlation between the two. As an example, the J/110 membership agreement allows 14–days use of the sailboat for the cost of the annual dues. The members are charged additional fees for additional uses. This is, plain and simple, a rental of a sailboat.

Appellee has persistently maintained that neither tax is applicable to dues paid by Club members. On December 30, 2005, appellee filed for a refund of both taxes paid from 2002 to 2005.[4] Appellee argued that the money paid by Club members was not subject to either tax because the fees paid by Club members were not used to "rent" boats. Rather, according to appellee, these fees entitled members to various privileges of the Club, which include use of boats, use of the marina and participation in Club-organized activities.

On March 6, 2006, the Comptroller denied appellee's request for a refund, stating that "the contracts submitted to the State of Maryland describe boat rentals" and "[u]sing the term 'member or membership' does not alter that fact."[5]

### Tax Court Appeal

Appellee appealed the Comptroller's denial of its tax refund request to the Maryland Tax Court. During the Tax Court

---

**4.** It appears that appellee initially requested a refund for taxes paid from 1999 to 2005. The Comptroller denied the request for some of these taxes on the grounds that they were barred by the applicable statute of limitations, which is four years from the date the tax was paid for the sales and use tax and three years for the admissions and amusement tax. *See* T.G. § 13–1104. At trial, appellee conceded that the statute of limitations barred part of its initial request.

**5.** Appellee argues that the Comptroller "has routinely received requests for advice from Maryland taxpayers regarding the taxation of club membership dues charged by taxpayers' sailing clubs." In support of this contention, appellee cites to various letters, submitted as exhibits at trial, issued by the Comptroller to various individuals and/or companies requesting advice as to whether either the admissions and amusement tax or the sales and use tax applied to clubs that provide members with use of boats or yachts. In these letters, the Comptroller expressed that either or both taxes is applicable to club fees that involve boat rentals.

proceedings, Mikulski and Cheryl Keyworth, appellee's office manager, testified on behalf of appellee. Appellee also presented Arthur Savage and Harold Brown, two Club members. They both stated that membership in the Club was a cost effective way to be able to sail boats as well as participate in other club activities. Savage testified that the "main purpose" of joining the Club was "to go sailing when I want to go sailing." Brown stated that he became a member for the opportunity to sail.

The Comptroller's case consisted of the testimony of Theresa Trentler, the Comptroller's Refund Supervisor, Patricia David, the Comptroller's Field Audit Manager, and Daniel Riley, an Assistant Director of the Compliance Division. Trentler, who reviewed appellee's refund request, testified that the request was denied because the agreements entered into between the Club and its members involved boat rentals. Trentler based this determination on the "terminology used in the contracts," which included use of the word "demise." According to Trentler, it is the Comptroller's position that a rental occurs when a fee is paid in exchange for the transfer of control or possession over tangible goods. Trentler did not know of any regulation or any other statute that set forth this particular definition of "rental." Relying on T.G. § 4–101, Trentler determined that the Club's membership dues were used to rent recreational equipment. During cross-examination, Trentler conceded that the Comptroller did not investigate whether the Club's members were only allowed to use the boats on a definite number of occasions or the conditions or limitations placed upon a member's use of a boat.

David's testimony established that the Comptroller has consistently maintained the position that agreements, such as appellee's Club-member agreements, involve the transfer of tangible personal property, subject to both the admissions and amusement tax and the sales and use tax. David distinguished the use of equipment in a health club from the use of appellee's boats. According to David, the former did not involve the transfer of control over tangible personal property because a health club member would use a machine on the

health club floor. David had no knowledge as to whether the Club's dues were directly related to the use of the Club's facilities or equipment.

Riley testified that the sales and use tax is a transactional tax. To determine the applicable transaction in this case, the Comptroller analyzed appellee's membership agreement, which provided that the transaction involved the "demise," or rental, of a boat. He asserted that T.G. § 11–101, which sets forth relevant definitions under the sales and use tax statute, does not define the term "rental." Accordingly, the Comptroller relies on the common usage of the word in addition to other case law. As for the admissions and amusement tax, Riley maintained that the membership fee, even if paid once a year, constituted a periodic payment for the rental of equipment, which was taxable under T.G. § 4–101(b)(1)(iv). Riley noted that the membership agreement did not describe appellee's other Club "benefits." Riley conceded that he was not aware if anyone from the Comptroller's office conducted an on-site visit or investigation of appellee's operations.

### Tax Court's Ruling

In an oral ruling from the bench, the Tax Court affirmed the denial of appellee's request for a refund, ruling that both the admissions and amusement tax and the sales and use tax were applicable to the Club's membership dues. The Tax Court recognized that Club privileges include sailing lessons as well as access to a crew database, an on-line reservation system and other social activities and community outreach events. Nonetheless, the Tax Court found "that these activities are really incidental to the main purpose of the club, which is to provide sailboats and powerboats to members of the public who join the club on an annual basis." The Tax Court emphasized that members of the Club paid different annual dues based upon the type of boat and varying levels of access to the boat. The Tax Court found that the on-line reservation system serves the purpose of the Club, "which is to rent boats to its members."

As to the applicability of the sales and use tax, the Tax Court referred to § 11–101(i) of the Tax–General Article, which defines a sale as a "transaction for a consideration whereby title or possession of property is transferred or is to be transferred absolutely or conditionally by any means, including by lease, rental, royalty agreement, or grant of a license for use[.]" The Tax Court ruled that the membership agreement constituted a "complete and full demise of the vehicle or vessel to its members, who shall, at the member's own expense, navigate and operate the vessel," adding that "members have full and exclusive control over the vessel during the time in which the member is using the vessel."

Citing to T.G. § 4–101, the Tax Court further ruled that, "where there's a transfer or use of rental equipment, the admissions and amusement tax applies." The Tax Court opined that the authority relied upon by appellee, namely, *Twinbrook Swimming Pool Corp. v. Comptroller of Treasury*, 274 Md. 88, 333 A.2d 49 (1975) and Md.Code Regs. (COMAR) 03.06.02.01,[6] was inapposite, because that authority applied only where the taxable transaction involved a charge for an admission to a place, "such as a golf course, tennis court, swimming pool or similar place." The Tax Court emphasized that the transaction at issue here is the renting of boats. Finally, the Tax Court ruled that appellee's constitutional argument, positing that T.G. § 4–101 and COMAR 03.06.02.01 were unconstitutionally vague, was without merit.

Appellee appealed the Tax Court's judgment to the circuit court, which vacated and remanded as to the imposition of both the admissions and amusement and sales and use tax. The circuit court affirmed the Tax Court's ruling as to appellee's constitutional argument. This appeal by the Comptroller followed. Additional facts will be discussed *infra* as warranted.

---

**6.** Both *Twinbrook* and COMAR 03.06.02.01 will be discussed in greater detail, *infra*.

## STANDARD OF REVIEW

 On an appeal from the decision of a circuit court affirming or reversing a Tax Court's decision, we review the Tax Court's judgment for error and not the judgment of the circuit court.[7] *Comptroller of Treasury v. Clise Coal, Inc.*, 173 Md.App. 689, 697, 920 A.2d 561 (2007). The Tax Court is an administrative agency and our review of its decisions is very limited. *Comptroller of Treasury v. Clyde's of Chevy Chase, Inc.*, 377 Md. 471, 481, 833 A.2d 1014 (2003); *see also* T.G. § 13–532(a). "Accordingly, in this case, we are limited to determining the legality of the decision of the Tax Court and whether there was 'substantial evidence' in the record to support its findings and conclusions." *Clyde's of Chevy Chase*, 377 Md. at 482, 833 A.2d 1014 (quoting *Supervisor of Assessments of Baltimore County v. Keeler*, 362 Md. 198, 207–08, 764 A.2d 821 (2001) (internal citations omitted)).

 If the Tax Court's decision is based on a factual determination, we must affirm that decision if it is supported by substantial evidence in the record. *Ramsay, Scarlett & Co. v. Comptroller of Treasury*, 302 Md. 825, 834, 490 A.2d 1296 (1985). Moreover, " 'the interpretation of tax law can be a mixed question of fact and law, the resolution of which requires agency expertise.' " *Comptroller of Treasury v. Science Applications Int'l Corp.*, 405 Md. 185, 204, 950 A.2d 766 (2008) (quoting *Comptroller of Treasury v. Citicorp Int'l Commc'ns, Inc.*, 389 Md. 156, 164, 884 A.2d 112 (2005)). "[D]eterminations involving mixed questions of fact and law must be affirmed if, after deferring to the Tax Court's expertise and to the presumption that the decision is correct, a reasoning mind could have reached the Tax Court's conclusion." *NCR Corp. v. Comptroller of Treasury*, 313 Md. 118, 133–34, 544 A.2d 764 (1988) (internal citations and quotations omitted); *see also*

---

**7.** In his brief, the Comptroller argues that "the circuit court did not apply the proper, deferential standard of review in analyzing the decision of the Tax Court, an administrative agency." Because we review the decision of the Tax Court and not the circuit court, we need not address, with specificity, this particular point.

*Science Applications Int'l Corp.*, 405 Md. at 204–05, 950 A.2d 766.

We may overturn the Tax Court's decision if it is based on an erroneous conclusion of law. *Comptroller of Treasury v. Blanton,* 390 Md. 528, 534–35, 890 A.2d 279 (2006). Nonetheless, "an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Id.* at 533–34, 890 A.2d 279.

This case also requires us to review various provisions of the Tax–General Article. The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the legislature. *Miller v. Comptroller of Maryland,* 398 Md. 272, 282, 920 A.2d 467 (2007) (quoting *Rockwood Casualty Ins. Co. v. Uninsured Employers' Fund,* 385 Md. 99, 108–09, 867 A.2d 1026 (2005)). The first step in determining the intent of the legislature is to examine the statutory language and give effect to the clear, unambiguous and plain meaning of the words of the statute, construed according to their common and every day meaning. *Id.* (quoting *Rockwood Casualty Ins. Co.,* 385 Md. at 108, 867 A.2d 1026 (internal citations omitted)). We give statutes their "most reasonable interpretation, in accord with logic and common sense" and seek to "avoid a construction not otherwise evident by the words actually used." *Greco v. State,* 347 Md. 423, 429, 701 A.2d 419 (1997); *see also Miller,* 398 Md. at 283, 920 A.2d 467. In addition,

a reviewing court may not extend the reach of a tax statute "beyond the clear import of the language employed," and where there is doubt as to such a statute's scope, it should be construed "most strongly" in favor of the taxpayer. A strict construction must nonetheless be fair, reasonable, and consistent with the legislative intent. The canon in favor of strict construction "is not an inexorable command to override common sense and evident statutory purpose."

*Director of Finance for Mayor & City Council of Baltimore v. Charles Towers P'ship,* 104 Md.App. 710, 717, 657 A.2d 808

(1995), *aff'd*, 343 Md. 567, 683 A.2d 512 (1996) (internal citations omitted).

With these standards of review in mind, we turn to the substantive issues presented.

## I

### Sales and Use Tax

Section 11–102(a) of the Tax–General Article provides that, except as otherwise provided in the statute, a tax is imposed on (1) a retail sale in the State; and (2) a use, in the State, of tangible personal property or a taxable service. Section 11–101(h) defines "retail sale" as, *inter alia*, the sale of tangible personal property. The term "sale" is further defined under T.G. § 11–101(i)(2)(i) as "a transaction for a consideration whereby ... title or possession of property is transferred or is to be transferred absolutely or conditionally by any means, including by lease, rental, royalty agreement, or grant of a license for use[.]" Section 11–103(a) establishes a rebuttable presumption that "any sale in the State is subject to the sales and use tax imposed under § 11–102(a)(1) of this subtitle." T.G. § 11–103(b) places the burden of proving that a sale is not subject to the sales and use tax on the person required to pay the tax.

The Comptroller argues that the Tax Court was correct in ruling that the transaction at the core of appellee's membership agreement is the rental of boats, even if appellee chooses to characterize the annual fee paid by Club members as "club dues." According to the Comptroller, the money charged by appellee for the rental of its boats is subject to the sales and use tax because it constitutes a retail sale.

Appellee argues that the Tax Court's decision was "legally erroneous and not supported by substantial evidence in light of the entire record." Appellee maintains that the Tax Court erred in ruling that the Club "rents its boats on a yearly basis to its members subject to certain restrictions as to time slots and number of days in usage," because, according to appellee, "[t]he transfer of possession is only during a reserved time,

and therefore cannot be for the entire year." Appellee emphasizes that it does not charge members a per-use cost for the boats, distinguishing Club members' access to appellee's boats from other rental situations, noting that, "when one rents a car, one only pays for the time one is in possession of it; whereas the dues paid by the Boating Club's members entitle them to the use of a vessel, regardless of whether or not they actually take possession."

Appellee further argues that the Club's annual membership dues pay for more than mere use and possession of the Club's boats, providing also for member access to appellee's complex on-line reservation system along with the ability to participate in social activities and other events organized by appellee. Appellee asserts that the Club's on-line reservation service "is the dominant reason that members join the Club."

The Tax Court's determination that Club membership fees constitute boat rental charges subject to the sales and use tax involves a mixed question of law and fact. As we explained in the preceding section, we defer to the Tax Court's expertise on mixed questions of law and fact and apply the presumption that the Tax Court's decision was correct. We affirm that decision if a reasoning mind could have reached the same conclusion. For the reasons we set forth below, we hold that the Tax Court's conclusion was legally correct and supported by substantial evidence in the record.

## A.

Appellee's argument is premised on two main propositions. The first is that Club membership fees do not constitute boat rental charges because they are used to pay for Club services as well as the ability to use Club boats. The second is that Club membership fees do not constitute boat rental charges because the fees are assessed on an annual basis, whereas actual possession of a boat is only transferred to a member upon request and based on vessel availability. We are aware of no Maryland case that addresses the issues presented in the specific factual context before us. However, the Court of

Appeals decision in *Quotron Systems, Inc. v. Comptroller of Treasury,* 287 Md. 178, 411 A.2d 439 (1980), provides an appropriate framework for our analysis. In addition, because appellee argues that the Tax Court misapplied the "*Quotron* standard" and the Comptroller attempts to distinguish *Quotron,* we deem it useful to examine the *Quotron* holding in some detail.

In *Quotron,* 287 Md. at 180, 411 A.2d 439, the Court of Appeals addressed whether a company that provides information services, such as a financial or news updates, *via* computer hardware provided to its subscribers, is subject to a use tax[8] on the portion of the company's monthly charges attributable to the use of the hardware. While the transactions between appellee and its Club members are factually distinguishable from the services and hardware provided in *Quotron,* the Court's analysis in *Quotron* is instructive in a determination of the applicability of a sales and use tax where a taxpayer maintains that its club membership fees pay for *both* club services and a member's use of the club's vessels.[9]

In *Quotron,* the Court of Appeals held that,

in order to determine whether a sales tax can be imposed when a company provides both a service and related equipment, a two-step analysis must be employed. First, the overall function must be characterized by the examination of

---

**8.** Although *Quotron* dealt with the application of a use tax, it relied on previous Maryland cases discussing the application of a sales tax, explaining: "The sales and use taxes are complementary so that if a transaction is not subject to the sales tax, it is not subject to the use tax." 287 Md. at 186, 411 A.2d 439.

**9.** We do not hold that the *Quotron* two-step analysis, discussed *infra,* must always be undertaken whenever a club disputes the applicability of a sales and use tax to member dues or fees. We simply hold that *Quotron* helps define the nature of the club-member transaction in this case. As we shall explain, *Quotron* examined, *inter alia,* the degree of control over hardware or equipment in determining whether a transfer of possession had occurred in that case. As the *Quotron* Court stated, "control is the critical factor in determining whether any type of transfer of possession, including a lease, has occurred." *Quotron,* 287 Md. at 186, 411 A.2d 439.

various factors as either a rental or transfer of possession, or a service. Secondly, it must be determined whether that function is subject to a sales tax.

*Id.* at 184, 411 A.2d 439. The Court discussed its previous holding in *Comptroller of Treasury v. Chesapeake & Potomac Telephone Co.*, 241 Md. 345, 216 A.2d 717 (1966), where the Court used this two—step analysis to determine that a monthly charge from a telephone company providing both teletypewriter equipment and services to its subscribers did not constitute a rental of equipment and was not subject to the sales and use tax. *Id.* at 183, 411 A.2d 439. The Court explained:

> In *C & P*, the Court expressly relied upon two standards, the *control of the equipment* and the *dominant purpose of the contract*, in characterizing C & P's single, overall function as a service. The Court, however, also took into account *the relationship between the equipment and the service* when it found that the sole function of the equipment was to transmit and receive communications and that it had no utility in and of itself. Courts in other jurisdictions which similarly have examined the relationship between equipment and services in characterizing an overall function, have applied a third standard. This standard was expressed by the Supreme Court of Illinois in *Snite v. Department of Revenue*, 398 Ill. 41, 46, 74 N.E.2d 877, 879–80 (1947), as follows:
>
> > "If the article sold has no value to the purchaser except as a result of services rendered by the vendor and the transfer of the article to the purchaser is an actual and necessary part of the service rendered, then the vendor is engaged in the business of rendering service and not in the business of selling at retail. If the article sold is the substance of the transaction and the service rendered is merely incidental to and an inseparable part of the transfer to the purchaser of the article sold, then the vendor is engaged in the business of selling at retail, and the tax which he pays for the privilege of engaging in such

business is measured by the price which the purchaser pays for the article and the service incident thereto."

In our view, this standard, like the standards of the control of the equipment and the dominant purpose of the contract, is applicable when characterizing the overall function of a company which provides both a service and related equipment.

*Id.* at 185, 411 A.2d 439 (emphasis added).

i

 Discussing *Quotron,* appellee maintains that the "Tax Court's finding that the overall function of the Boating Club's operation was the rental of boats is not supported by substantial evidence in light of the record." We disagree. That the "dominant purpose" of the membership agreement, by which the member was obligated to pay the annual membership fee, is the member's use of appellee's boats is supported by the record. Savage and Brown, both testifying on behalf of appellee, stated that they became members of the Club to use the Club's boats. The language of various 2003, 2004 and 2005 membership agreements, submitted as exhibits by appellee, also support a finding that the dominant purpose of the Club-member transaction was the transfer of the right to use appellee's vessels. For example, a 2003 Level 1 Membership Agreement includes the following language:

This annual membership agreement [is] made between [appellee], herein called **JPSC,** and the undersigned member, of said association, herein called **MEMBER,** *for the purposes of chartering [appellee's] vessels.* MEMBER receives unlimited day sailing aboard a J/80. MEMBERS interested in racing must achieve [appellee's] approval. This membership agreement is valid for one (1) year. [ . . . ].

This Agreement is a full and complete demise of the vessel to the MEMBER who shall, at Member's own expense, navigate and operate the vessel. MEMBER shall have full and exclusive control over the vessel during the time in which the MEMBER is using the vessel.

The above name[d] person, having satisfactorily completed the Preliminary Checkout and having paid in full all Season Charges, is hereby accepted as a member of JPORT SAIL-ING CLUB and is accorded all rights and privileges thereof.

(Emphasis added). This language was repeated in other membership agreements, with language added or deleted in order to convey a substantive difference in the degree of member access to different vessels, consistent with the multiple "levels" of membership offered by appellee. These substantive differences were reflected in the annual membership fee, which increased or decreased accordingly. Moreover, the membership fee itself was directly related to the use of the boats, as Mikulski testified that the price of the membership agreement was established by calculating the total expense of the boats, including insurance and maintenance costs, determining a suitable profit margin and dividing that total amount by the number of anticipated members for the coming year.

In addition, the terms of the membership agreement, embodied in "Schedule A" of the membership agreement, consistently set forth restrictions on a member's *use* of the vessel. Schedule A included a section entitled "General Club Policies" that addressed exclusively a member's use and treatment of the vessel and cancellation of reservations. Apart from conditions placed on a member's use and care of the vessel, these membership agreements discussed no other benefits or privileges of Club membership.

With respect to the control of the equipment, the membership agreements indicated that appellee *chartered* and *demised* its vessel to the member who retained full and exclusive control of the vessel during its use. *C.f. Quotron,* 287 Md. at 187–88, 411 A.2d 439 (observing that the "contract between Quotron and its subscribers did not provide for the rental of hardware" and "repeatedly characterized Quotron's activities as a service"). These two terms, when used in conjunction with the transfer of a right to use a vessel, have specific meanings. In *Brittingham v. Tugboat Underwriting Syndicate,* 262 Md. 134, 137–38, 277 A.2d 8 (1971), a case construing

the term "owner" as used in a maritime insurance policy, the Court of Appeals discussed the meaning of the word "demise." After stating that "it is well established that a bareboat charterer is for many purposes an owner during the demise," the Court quoted from Gilmore and Black, *The Law of Admiralty* §§ 4–20 and 4–23 (1957), which state, in pertinent part:

> The demise, in practical effect and in important legal consequence, shifts the possession and control of the vessel from one person to another, just as the shoreside lease of real property shifts many of the incidents of ownership from lessor to lessee.

262 Md. at 137, 277 A.2d 8. BLACK'S LAW DICTIONARY 250 (8th Ed.2004) refers to a "demise charter" as a "bareboat charter," defining both as a "charter under which the shipowner surrenders possession and control of the vessel to the charterer, who then succeeds to many of the shipowner's rights and obligations."

To be sure, Mikulski testified that the "demise" language originated from earlier contracts where appellee chartered vessels, adding that, as a practical matter, appellee did not "demise" boats to Club members. While we agree with appellee that the mere use of the word "demise" or "charter" is not dispositive as to the nature of the Club-member relationship, the use of these terms, under these circumstances, highlights what is established by the entire contract, namely, that the Club-member transaction revolved around transferring the right to use and control appellee's boats during distinct periods of time. While appellee may have maintained and insured the vessels, members retained, in the words of the membership agreement, "full and exclusive control" of the vessels while they were using them. Indeed, the agreement required members to pay all "running expenses during the term of the reservation, including fuels, oil, telephone, food, pilotage, port charges and provisions and supplies for himself [or herself] and his [or her] crew."

Finally, in examining the "relationship between equipment and services," the services provided to Club members are

incidental to, or supportive of, the dominant purpose of Club membership, which is a member's right to use and control the boats. Unlike in *Quotron*, where the "sole function of the hardware provided to Maryland subscribers was to receive financial information services provided by *Quotron*," *id.* at 187, 411 A.2d 439, the sole function of appellee's on-line reservation system is to facilitate member access to appellee's vessels. In addition, most of the Club's social and community outreach activities are organized around the use of appellee's vessels.

In light of the foregoing analysis, the primary function of the Club-member agreement is to provide for the payment of a fee in exchange for the transfer of a right to use and control certain Club vessels at specified times, consistent with various levels of membership. Appellee's argument that the "overall function of the Boating Club is to offer the unlimited access to 14 sailboats to approximately 142–171 members, on a first-come, first-served basis" only highlights that the purpose of the Club is to provide access to *the use of appellee's boats*. The methods by which a member could achieve that access, including through the online reservation system, are incidental to the ultimate transaction.

## ii

Having determined that the overall function of the Club-member agreement is to establish a member's right to use and possess appellee's boats, we turn to a consideration of whether the annual Club membership fee is subject to the sales tax. *See Quotron*, 287 Md. at 188–89, 411 A.2d 439. The Tax–General Article provides that a sales and use tax is imposed on any "retail sale," which T.G. § 11–101(h)(1)(i) defines as including the sale of tangible personal property. T.G. § 11–101(i)(1)(i) further provides that a "sale" involves "a transaction for a consideration whereby ... title *or possession* of property is transferred or is to be transferred absolutely *or conditionally* by any means, *including by lease [or] rental....* " (Emphasis added). In order for the Club's membership dues to be taxable under this statute for the reasons set forth by the Tax Court, it must involve a transaction for

consideration where possession of the vessel is transferred or *is to be* transferred, even if conditionally, by way of a rental.

■ The sales and use tax statute does not expressly define the term "rent." "Where a word is used in a statute and not specifically defined, it should be construed as having its ordinary and commonly accepted meaning." *Quotron,* 287 Md. at 186 n. 5, 411 A.2d 439 (internal citations omitted); *see also Washington Nat'l Arena Ltd. P'ship v. Comptroller of Treasury,* 308 Md. 370, 375, 519 A.2d 1277 (1987). BLACK'S LAW DICTIONARY 1322 (8th ed.2004) defines "rent" as "[c]onsideration paid, usu[ally] periodically, for the use or occupancy of property...." COMAR also refers to the term "rent" as a "lease":

> The transfer of possession, absolutely or conditionally by any means, of tangible personal property for a consideration, by way of lease, rental, royalty agreement, or grant of a license for use, *referred to in this regulation as a "lease",* is included within the statutory definition of the term "sale" and is thus subject to the [sales and use] tax in the absence of a specific exemption.

COMAR 03.06.01.28(A) (emphasis added).

In *Citicorp Int'l,* 389 Md. at 166 n. 1, 884 A.2d 112, a case dealing with the applicability of the sales tax to a fee paid to terminate an equipment lease, the Court of Appeals observed that "Title 11 of the Tax–General Article does not define the term 'lease'" and added, "Section 2A–103(j) of the Commercial Law Article, however, defines the term as 'a transfer of the right to possession and use of goods for a term in return for consideration....'" (Internal citations omitted). *See also* BLACK'S LAW DICTIONARY 907 (8th ed.2004) (defining "lease" as, *inter alia,* a "contract by which the rightful possessor of personal property conveys the right to use that property in exchange for consideration.").

■ In light of the foregoing, the plain and ordinary meaning of the term "rent" in T.G. § 11–101(i), as we see it, encompasses the exchange of consideration for the right to use and possess tangible personal property at specified periods of

time. In this case, members pay an annual fee for the right to possess appellee's vessels when requested and on certain conditions. Accordingly, we hold that the membership fee in this instance constitutes a rental within the meaning of T.G. § 11–101(h).

Appellee argues that the Club did not transfer possession of a particular boat to a member for an entire year. A member, appellee contends, would only retain possession of a vessel for a fraction of the year, at those times when the Club transferred the requested boat. Appellee notes that the Club did not, during those transfers, charge a "per-use" fee. The failure of the Club to charge a "per-use" fee, in our judgment, is not dispositive under these circumstances. While the term "possession" is not defined in the sales tax statute, it is ordinarily understood as including both actual and constructive possession. BLACK'S LAW DICTIONARY 607 (5th ed.1983) defines possession as follows:

> The law, in general, recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly has direct physical control over a thing, at a given time, is then in actual possession of it. A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it. The law recognizes also that possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.

*See also* BLACK'S LAW DICTIONARY 1201–02 (8th ed.2004) (defining actual, constructive and joint possession). When members are in actual possession of appellee's boats, they retain "full and exclusive control" over them. When members are not in actual possession of the boats, they maintain a type of constructive possession over them, because they are entitled to actual possession over the boats, consistent with the conditions

set forth in the membership agreement.[10] To be sure, there are limits on the scope of a member's possession. A member cannot, for example, order that certain maintenance work be undertaken on a particular boat. However, those limits do not mean that members have no possessory rights over the boats when they are not actually using them.

For the foregoing reasons, the Tax Court's determination that the annual membership fee fell within the ambit of the sales and use tax statute was based on a legally correct interpretation of relevant statutes. Moreover, the Tax Court's factual conclusions were based on substantial evidence in the record. We do not agree with appellee that the Tax Court's ruling was based only on what appellee characterizes as "the Comptroller's arbitrary and conclusory assertions." Although appellee argues that the Comptroller's employees were not aware of any rules or regulations that would help them determine whether appellee "rented" boats, the testimony of these employees reflected their understanding that a rental occurred when a fee was paid in exchange for the transfer of control over tangible personal property. In addition, while appellee argues that the Comptroller's employers did not know whether appellee allowed use of boats for the entire year or on a definite number of occasions, their testimony indicated that they based the denial of the tax refund request, in large part, on the terms set forth in appellee's membership agreements. In any event, the Tax Court did not base its ultimate ruling solely on the testimony of the Comptroller's employees. We perceive no error.

---

**10.** The Comptroller analogizes the rental of boats in this case to the rental of cars, noting that a person who rents a car and never uses it pays the same rental fee as someone who rents a car and consistently uses it. Appellee argues that this "is a flawed analogy, because when one rents a car, one only pays for the time one is in possession of it; whereas the dues paid by the Boating Club's members entitle them to the use of a vessel, regardless of whether or not they actually take possession." Appellee adds that, "when one rents a car, only that person may have possession; whereas during the annual club membership, a Boating Club member can take possession of a boat when it is not in use by another." We need not take a position on the applicability of the car rental analogy because our holding is not dependent on it.

## B.

Appellee argues that, "assuming *arguendo* that any tax was due, it was legally erroneous for the Tax Court not to order the Comptroller to allocate between the taxable part of the Boating Club's duties, and the non-taxable part, and refund the latter." Appellee adds that, because it only transferred possession of Club vessels to a member for a small fraction of the year, only that portion of membership dues attributable to the percentage of actual use is subject to the sales tax. Appellee maintains that it was "legally erroneous for the Tax Court not to order [appellee] to allocate between the taxable part of the Boating Club's dues, and the non-taxable part, and refund the latter."

As an initial matter, appellee cites to no part of the record extract indicating that it presented this argument to the Tax Court. In addition, the single case cited by appellee does not provide substantive support for its argument. We explain.

In *Washington Nat'l Arena*, 308 Md. at 371–72, 519 A.2d 1277, the Court of Appeals addressed the question of whether "a single charge covering admission to events, parking, and club membership may be allocated, for admission tax purposes, between the sum apportionable to admission and the sums apportionable to other items." In that case, the Tax Court held that the admissions tax statute did not permit allocation of taxes as a matter of law. *Id.* The Court of Appeals held that allocation was permitted as a matter of law and remanded the case for a determination of whether allocation was appropriate under the facts of the case. *Id.*

The facts of *Washington Nat. Arena* are inapposite to the case *sub judice* in that, there, the taxpayer offered a single price package arrangement that covered admission into facilities as well as all amenities, including parking in reserved areas and club membership in a restaurant and bar. *Id.* at 373, 519 A.2d 1277. The taxpayer argued that the Comptroller should determine the cost of amenities apart from the admission price and asserted that only the latter should be

taxed. *Id.* at 374, 519 A.2d 1277. The Court of Appeals agreed, opining:

> [W]e think that when a package includes the price of admission and the price of largely unrelated amenities, the legislature intended there to be an allocation of the charge between that portion relating to admissions and that portion not so related. *Our predecessors had no difficulty in deciding that such an allocation should be made under the sales tax law, when in a single transaction both real estate (not taxable under the sales tax law) and personalty (taxable) were sold for a single price.* The Attorney General reached a similar conclusion in the sales tax context. When the sale of an entire business included the transfer of some items that were subject to the sales tax and some items that were not, he opined that "[n]ormally it will be necessary for [the Comptroller] to make an administrative determination in individual cases as to what property transferred in a particular transaction is, in fact, subject to the tax."

*Id.* at 376–77, 519 A.2d 1277 (emphasis added and internal citations omitted).

The above passage indicates that allocation of the sales tax is appropriate where a sale includes both taxable and non-taxable items. Here, however, appellee's allocation argument rests entirely on its contention that members should not be taxed for the days they did not use the boats. The transaction subject to taxation in this case is the retail sale or rental of the Club's boats. We have explained that the signing of the membership agreement and tendering of applicable fees constituted consideration paid for the right to possession, both actual and constructive, of a vessel for a set term consistent with the conditions of the membership agreement. Based on Mikulski's testimony, the membership fee was set at a level determined to cover the total expense of the boats along with a profit margin for appellee. Under the circumstances of this case, it is the annual membership fee that constitutes the taxable transaction, not the number of times a member actually uses the boat. *See also* COMAR 03.06.01.28(B) ("Each *lease payment period* is considered a separate lease, and thus *a*

*separate sale,* for the purpose of determining when the [sales and use] tax is to be collected or paid.") (emphasis added).

## II

### Admissions and Amusement Tax

Section 4–102(a)(1) of the Tax–General Article authorizes a county to impose a tax on the gross receipts derived from any admissions and amusement charge in that county. T.G. § 4–101(b)(1) defines an admissions and amusement charge as follows:

"Admissions and amusement charge," unless expressly provided otherwise, means a charge for:

(i) admission to a place, including any additional separate charge for admission within an enclosure;

(ii) use of a game of entertainment;

(iii) use of a recreational or sports facility;

(iv) use or rental of recreational or sports equipment; and

(v) merchandise, refreshments, or a service sold or served in connection with entertainment at a nightclub or room in a hotel, restaurant, hall, or other place where dancing privileges, music, or other entertainment is provided.

The Comptroller argued that appellee's membership fees constitute a charge for use or rental of recreational or sports equipment. Citing to both *Twinbrook, supra,* and COMAR 03.06.02.01, appellee argued that its membership fees are exempt from the admissions and amusements tax. The Tax Court rejected appellee's argument:

The Court agrees with the Comptroller that *Twinbrook* is inapposite to the subject situation. In *Twinbrook* there was a concern regarding the applicability of the amusement and admissions tax under [T.G. § ] 4–101 as an admission to a place. Also[,] COMAR 03.06.02.01 is applicable, by its terms, only to an admission to a place. This section, clearly, in the Court's opinion, *refers to an admission to a place,* such as a golf course, tennis court, swimming pool or similar place. A boat is clearly not similar to a tennis court or

swimming pool. The boats are recreational equipment, taxable under Tax–General, Section 4–101, which imposes an admissions and amusement tax on the use or rental of recreational or sports equipment. There is no admission to a place guaranteed under the Membership Agreement. [Appellee] rents its boats on a yearly basis to its members subject to certain restrictions as to time slots and number of days of usage. Finally, [appellee] is renting sports equipment and such rentals are subject to admissions and amusement tax under the applicable sections.

(Emphasis added).

 The Tax Court ultimately ruled that, pursuant to T.G. § 4–101(b)(1)(iv), the Club's membership fees were subject to the admissions and amusement tax on the grounds that the fees constituted a charge for the use or rental of recreational or sports equipment. The Comptroller argues that the circuit court should not have reversed the Tax Court's conclusion because it was legally correct and based on substantial evidence in the record. We agree.

### A.

The Tax Court appropriately rejected appellee's argument that COMAR 03.06.02.01 exempted its membership fees from the admissions and amusement tax. COMAR 03.06.02.01 provides:

**.01 Club Membership.**

A. The *gross receipts derived from an amount paid to become regularly entitled to the privileges of a club or other organization,* as a member or otherwise, *do not* constitute an admissions and amusement charge subject to the tax, *even though* one of the privileges is the *admission to a clubhouse, club grounds, hall, restaurant, hotel, or other similar place.*

B. If the sole privilege of a charge described as "dues" is a right of *admission to certain performances or to a particular place* on a definite number of occasions, the gross receipts derived from the charges for these privi-

**638** 

leges are admissions and amusement charges subject to the tax.

C. The gross receipts derived from fees charged club members or nonmembers for the *use of a golf course, tennis court, swimming pool, or something similar* are subject to the tax *if* the charges are *directly related to the usage of the facility or equipment.*

(Emphasis added).

 " '[T]he interpretation of an agency rule is governed by the same principles that govern the interpretation of a Statute.' " *Miller,* 398 Md. at 282, 920 A.2d 467 (quoting *Md. Comm'n on Human Relations v. Bethlehem Steel Corp.,* 295 Md. 586, 592–93, 457 A.2d 1146 (1983)). In addition, "a great deal of deference is owed to an administrative agency's interpretation of its own regulation." *Md. Transp. Authority v. King,* 369 Md. 274, 288, 799 A.2d 1246 (2002). The plain language of COMAR 03.06.02.01 supports the Tax Court's conclusion that this particular regulation governs the taxability of club membership fees when those fees provide an individual with access or admission to a *place.*

Subsection (A) provides that gross receipts derived from an amount paid to become regularly entitled to club privileges *do not* constitute an admissions and amusement charge subject to the tax *even though* one of the privileges afforded by such membership is *admission to a clubhouse, club grounds, hall, restaurant, hotel or other similar place.* Under the admissions and amusement tax statute, a charge for admission to a place is taxable. T.G. § 4–101(b)(1)(i). Subsection (A) thus establishes that membership fees are not taxable under T.G. § 4–101(b)(1)(i) merely because one of the privileges of the membership is admission to a place.

The language of subsections (B) and (C) provides further support for the conclusion that COMAR 03.06.02.01 addresses instances when a club membership fee may be taxed because it provides admission to a particular place. Subsection (B) provides that a club membership fee *is* subject to the admissions and amusement tax if the *sole privilege* of a charge

described as "dues" is a right of *admission* to certain performances or particular places. Subsection (C) establishes that dues charged for the *use* of a golf course, tennis court, swimming pool *or something similar*, are also subject to the admissions and amusement tax if *directly related to the usage of the facility or equipment*. In other words, under subsection (C), the fact that club membership dues allow admission into and use of a sporting or recreational venue as a privilege of membership does not exempt it from the tax as long as the charges are directly related to the usage of facility or equipment, which is properly taxable under the statute. *See* T.G. §§ 4–101(b)(1)(iii) and (iv).

Ultimately, appellee's argument that COMAR 03.06.02.01(A) exempts its membership fees from the admissions and amusement tax merely because its fees generally constitute "an amount paid to become regularly entitled to the privileges of a club" is inconsistent with the plain language of the regulation. The Tax Court concluded that appellee's membership fees assessed a charge to rent appellee's boats—a conclusion that we have held, *supra*, to be legally correct and supported by substantial evidence in the record. The Tax Court appropriately determined that entrance into the marina to use appellee's boats was incidental to the use of the boats. Appellee concedes that its boats are "recreational equipment." The use or rental of recreational or sports equipment is subject to an admissions and amusement tax under T.G. § 4–101(b)(1)(iv).

## B.

We are similarly not persuaded by appellee's argument that the Tax Court erred when it found the Court of Appeals' decision in *Twinbrook, supra*, to be inapposite. In *Twinbrook*, Twinbrook Swimming Pool Corporation, the taxpayer, was organized for the purpose of constructing a community swimming pool. 274 Md. at 88–90, 333 A.2d 49. Twinbrook provided various life and annual memberships that provided members with admission into the swimming pool. *Id.* The Comptroller denied Twinbrook's request for a refund of admissions taxes imposed on those dues. *Id.* The Tax Court

affirmed the Comptroller's decision and the Court of Appeals reversed. *Id.*

The *Twinbrook* Court discussed 33 Op. Att'y Gen. 373 (1948), in which the Attorney General explained that the legislature did not intend to tax country club membership dues because (1) "it is well known that membership dues in a country club are spent, in the majority, for other than recreational or sports facilities" and (2) "it is from a practical standpoint impossible to determine what percentage of membership dues goes toward recreation and entertainment facilities of each individual member." *Id.* at 92, 333 A.2d 49 (quoting 33 Op. Att'y Gen. at 374–75). The Court also discussed the predecessor to COMAR 03.06.02.01, which we have analyzed *supra,* and explained that, "for all practical purposes," the regulation "followed the statutory interpretation adopted by the Attorney General." The Court further held that the General Assembly had impliedly acquiesced in the Attorney General's interpretation by reenacting the statute during intervening years. *Id.* at 94–95, 333 A.2d 49 (internal citations omitted).

The *Twinbrook* Court proceeded to analogize swimming club memberships to country club memberships, observing that in both cases (1) dues paid do not constitute a charge which is imposed upon each admission to the club premises or a part of the premises and (2) a member who uses club facilities daily pays the same amount as one who uses the facilities occasionally or not at all. *Id.* at 94–95, 333 A.2d 49. The Court then held:

If the amount paid by a member is in no way proportionate to his attendance or participation, it cannot be an admissions fee.

*Id.* at 95, 333 A.2d 49 (internal citations omitted). The Court added:

If operating expenses of a club are shared by its members without insistence upon equivalence between the proportion of an individual's contribution and the proportion of benefits

he [or she] receives, the payments which a member makes are dues.

*Id.* (internal citations omitted). The Twinbrook Court concluded that, "[i]f a swimming club has only one such facility—a pool—and dues-paying members are entitled to use it as often as they wish, the dues paid by members are no more subject to admissions tax than dues paid to a club with a single recreational facility . . . ." *Id.* at 95–96, 333 A.2d 49.

The Court of Appeals has later explained that *Twinbrook* does not hold that the cost of club membership is not a taxable admission charge as a matter of law:

In *Twinbrook* we held that club dues that are not proportionate to admission to the club-*i.e.,* charged whether or not the member ever uses the club-are not taxable under § 402 [of the amusement and admissions tax statute]. But if the membership charge is proportionate to admission to particular events, *Twinbrook* does not prohibit taxing membership as part of the charge for admission. Once again, it is for the fact-finder to decide whether admission to the club is reasonably related or functionally subordinate to the price of admission.

*Washington Nat. Arena,* 308 Md. at 377–78, 519 A.2d 1277.

We view *Twinbrook* as distinguishable from this case. *Twinbrook* dealt with club dues that the Comptroller sought to tax on the basis that they constituted a charge for admission into a place. The dues in *Twinbrook* did not reflect the number of times a member actually gained entrance into the facilities. In this case, the Tax Court affirmed the Comptroller's denial of a refund of the admissions and amusement tax based on T.G. § 4–101(b)(1)(iv), which provides for the taxation of the "use or rental of recreational or sports equipment." The taxable transaction is the "rental" of appellee's boats under conditions established by the membership agreement. As we have explained, Club members rent appellee's vessels for a specified term by paying membership fees in exchange for the right to exercise both actual and constructive possession of the boats for the term of their membership. In any

event, appellee's membership fees are proportionate to the benefit that members receive because these fees increase or decrease to reflect the degree of possession afforded each Club member based on the level of membership acquired.[11]

For the foregoing reasons, the Tax Court properly ruled that Club membership fees were taxable under T.G. § 4–101(b)(1)(iv) as a rental of recreational or sports equipment.

## III

### Appellee's Constitutional Argument

We briefly address a contention raised by appellee in its appellate brief. Appellee argued to the Tax Court that the statutory scheme established by T.G. § 4-101 and COMAR 03.06.02.01 was unconstitutionally vague. According to appellee, similarly situated businesses are not similarly taxed by the Comptroller. The Tax Court denied this constitutional claim on the grounds that it was not meritorious. The circuit court affirmed that ruling. Appellee asks us to hold that the Tax Court erred in rejecting appellee's constitutional argument. We decline to do so.

Under Rule 8–202(a), a notice of appeal must be filed within thirty days after entry of the judgment or order from which the appeal is taken. Appellee did not note an appeal to

---

11. The Comptroller cites to *Kettler Bros., Inc. v. Comptroller of the Treasury*, Miscellaneous No. 136, 1978 WL 1502 (Md. Tax Court, April 26, 1978), a memorandum opinion of the Tax Court, in support of his argument that *Twinbrook* does not require reversal of the Tax Court's decision in this case. In *Kettler Bros.*, the taxpayer argued that the admissions and amusement tax should not be imposed on receipts from the yearly rental of lockers because the annual dues paid by members to use the lockers were not proportionate to the number of times any member might use the locker. *Id.* at *1. The Tax Court held that *Twinbrook* did not apply because it dealt with admission into a place and not with the rental of sporting or recreational equipment. *Id.* at **1–2. The Tax Court concluded that the lockers are used in conjunction with sporting or recreational activity and taxable under the statute. *Id.* at *2. Appellee asks us to disregard *Kettler Bros.* on the grounds that it is unpersuasive. We have announced our holding in this case without relying on *Kettler Bros.* and decline to further discuss the merits of that opinion.

the circuit court's decision. The requirement "that an order of appeal be filed within thirty days of a final judgment, is jurisdictional; if the requirement is not met, the appellate court acquires no jurisdiction and the appeal must be dismissed.'" *Houghton v. County Comm'rs of Kent County,* 305 Md. 407, 413, 504 A.2d 1145 (1986). We are without jurisdiction to review appellee's constitutional argument and shall therefore dismiss it.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REINSTATE DECISION OF THE TAX COURT.**

**COSTS TO BE PAID BY APPELLEE.**